AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| *(Briefly describe the property to be seized)* | ) |
| | ) Case No.  21-sz-41 |
| ALL PETROLEUM-PRODUCT CARGO ONBOARD | ) |
| THE M/T ARINA WITH INTERNATIONAL | ) |
| MARITIME ORGANIZATION NUMBER 9189952 | ) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of _____ Columbia _____ is subject to forfeiture to the United States of America under _____ U.S.C. §

*(describe the property)*:

50 U.S.C. § 1701 et seq.; 18 U.S.C. § 1956; 18 U.S.C. §§ 981(a) & 982; 18 U.S.C. § 2339B(a)(1).

(describe the property):  ALL PETROLEUM-PRODUCT CARGO ONBOARD THE M/T ARINA WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9189952

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

❏ Continued on the attached sheet.

_____
*Applicant's signature*

Cindy Burnham, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  10/26/2021

_____
*Judge's signature*

City and state:  District of Columbia

G. Michael Harvey, United States Magistrate Judge
_____
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| ALL PETROLEUM-PRODUCT CARGO ONBOARD | ) | Case No.   21-sz-41 |
| THE M/T ARINA WITH INTERNATIONAL | ) | |
| MARITIME ORGANIZATION NUMBER 9189952 | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the    jurisdiction of the        District of          Columbia        be seized as being subject to forfeiture to the United States of America.  The property is described as follows:
ALL PETROLEUM-PRODUCT CARGO ONBOARD THE M/T ARINA WITH INTERNATIONAL
MARITIME ORGANIZATION NUMBER 9189952

 AS FURTHER DESCRIBED IN THE AFFIDAVIT
I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before ___11/09/2021___
*(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge ___G. Michael Harvey___ .
*(name)*

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ❑ for _____ days *(not to exceed 30)*.

❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:    ___10/26/2021___        _____
*Judge's signature*

City and state:      District of Columbia        G. Michael Harvey, United States Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br><br>21-sz-41 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| Certification |
|---|
|       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF ALL PETROLEUM-PRODUCT CARGO ONBOARD THE M/T ARINA WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9189952** | **CASE NO. 21-sz-41**<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Cindy Burnham, a Special Agent with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant. I have been a Special Agent with the FBI since April 2006. Since that time, I have been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export violations, and counterproliferation. During my work with the FBI, I have executed, or participated in the execution of search warrants and have seized evidence of criminal violations. I have conducted and participated in other investigations related to violations of U.S. export laws and regulations, and sanctions violations. I have been involved in investigations involving the illegal export of controlled items, as well as investigations involving the illegal use of the U.S. financial system to facilitate petroleum sales for the benefit of the Government of Iran.

2.      Based upon my training and experience, I am familiar with the methods of operation employed by subjects in national security investigations to obfuscate their involvement in transactions for the purpose of circumventing sanctions imposed by the United States and the United Nations ("UN").

1

3.      I have been one of the case agents in this investigation, which is worked jointly with Homeland Security Investigations. The information obtained over the course of the investigation has revealed designated entities are violating U.S. laws and regulations by laundering U.S. dollar payments by sending wire transfers through correspondent accounts at U.S. financial institutions to facilitate purchases and related transactions for the Islamic Revolutionary Guard Corps ("IRGC") and the Qods Force of the Islamic Revolutionary Guard Corps ("IRGC-QF"), a designated terrorist organization. During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and other related cases with agents, law enforcement officers, and partners at other U.S. Government agencies who have been involved in these investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a variety of other sources, including law enforcement officers and agents, witness interviews, public records, bank records, and documents discussed herein.

## I.      <u>PURPOSE OF AFFIDAVIT</u>

4.      This affidavit is made in support of a seizure warrant for all petroleum product (the "Target Cargo") onboard the M/T ARINA (International Maritime Organization ("IMO") No. 9189952) (the "ARINA"), which is estimated to be approximately 513,083 barrels.

5.      As further described herein, the Target Cargo was obtained from an oil tanker owned by the National Iranian Tanker Company ("NITC"), which has been designated by the U.S. Department of the Treasury as a supporter of the IRGC-QF, a U.S. State Department designated foreign terrorist organization. The Target Cargo is a source of influence over NITC and IRGC-QF within the meaning of 18 U.S.C. § 981(a)(1)(G)(i). In transferring the Target Cargo for the

purposes of sale, NITC provided or attempted to provide resources to IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

6.      The Target Cargo is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i).

7.      There is probable cause to believe that the Target Cargo is subject to seizure and forfeiture as assets of, or assets that afford a source of influence over, a foreign terrorist organization.

## II.      STATUTORY BACKGROUND

### A.      IRGC and the IRGC-QF

8.      On October 25, 2007, the Department of the Treasury designated the IRGC-QF pursuant to Executive Order No. 13224 for providing lethal support to multiple terrorist organizations. That same day, the Department of the Treasury also designated the IRGC pursuant to Executive Order No. 13382 for its support of Iran's ballistic missile and nuclear programs.

9.      On March 14, 2016, the Department of the Treasury designated the National Iranian Oil Company ("NIOC") pursuant to Executive Order No. 13599, which targets the property of the Government of Iran.

10.      On October 13, 2017, the Department of the Treasury designated the IRGC pursuant to Executive Order No. 13224 for providing material support to the IRGC-QF, including by providing training, personnel, and military equipment.

11.      On November 5, 2018, the Department of the Treasury designated NIOC's subsidiary, NITC, pursuant to Executive Order No. 13599 for its connections to the Government of Iran and its role in the Iranian shipping sector. A previous Treasury Department press release noted that NIOC was owned by the Government of Iran through the Ministry of Petroleum, and was responsible for the exploration, production, refining, and export of oil and petroleum products

in Iran. It further noted the close relationship between the IRGC and NIOC. Similarly, a previous Treasury Department press release noted that NITC was a Government of Iran entity, which employed various front companies.

12.     On April 8, 2019, the State Department designated the IRGC as a Foreign Terrorist Organization pursuant to Executive Order No. 13224. The designation noted that the IRGC actively finances and promotes terrorism, and noted that "the IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign."

13.     On January 23, 2020, the Department of the Treasury described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies."

14.     On October 26, 2020, the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, designated NITC and NIOC pursuant to counter-terrorism sanctions for their financial support to Iran's IRGC-QF.

15.     According to the Department of the Treasury's statements related to IRGC designations, the IRGC and its major holdings are a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry.

**B.     Forfeiture Statutes**

16.     This application seeks a seizure warrant under both civil and criminal authorities because the Target Cargo could easily be placed beyond process if not seized by a warrant. The Target Cargo is a liquid petroleum product which is easily transferred. The Target Cargo is

currently held onboard the ARINA, currently located in the Mediterranean Sea north of the Suez Canal.

17.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Thus, seizure warrants may be obtained outside of the district where the property to be seized is located.

18.     Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), all assets, foreign or domestic, of an organization engaged in planning or perpetrating any federal crime of terrorism [as defined in 18 U.S.C. § 2332b(g)(5)] against the United States, citizens, or residents of the United States, or their property, are subject to civil forfeiture, as are all assets, foreign or domestic, *affording any person a source of influence over any such entity or organization.* Pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

    a.     18 U.S.C. § 98l(a)(l)(G)(i) covers two categories of property relating to any individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism [as defined in section 2332b(g)(5)] against the United States, citizens or residents of the United States, or their property: (1) all assets, foreign or domestic of such individual, entity, or organization; and (2) all assets, foreign and domestic, affording any person a source of influence over the terrorist entity or organization. "That is, the statute empowers the government to seek the forfeiture

of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations." *United States v. One Gold Ring with Carved Gemstone*, No. 16-CV-02442-TFH, 2019 WL 5853493, at *1 (D.D.C. Nov. 7, 2019).

b.      In a similar case involving petroleum products linked to the IRGC, this court found "that there is probable cause to believe that the Defendant Properties are foreign assets of the [IRGC], a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property, or are foreign assets affording a the identified subjects a source of influence over the IRGC." *United States v. All Petroleum-Prod. Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. CV 20-1791, 2020 WL 3771953, at *1 (D.D.C. July 2, 2020).

c.      The terrorism forfeiture authorities apply to a larger class of property than traditional forfeiture authorities. Terrorism-based forfeitures cover the broadest categories of property, as it includes *all* property foreign and domestic of a terrorist organization, irrespective of whether the property has any nexus to the crime or the United States, and all property of a third party that promotes/facilitates the activity of the terrorist organization. *See United States v. Oil Tanker Bearing International Maritime Organization Number 9116512*, 19-cv-1989, 2020 WL 4569424, *4-5 (D.D.C. Aug. 7, 2020) (defining the broad scope of § 981(a)(1)(G)(i)); *United States v. One Gold Ring with Carved Gemstone*, No. 16-CV-02442-TFH, 2019 WL

5853493, at *1 (D.D.C. Nov. 7, 2019) ("That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations.").

    d.    "This court is the sole jurisdiction where such litigation is properly lodged." *One Gold Ring with Carved Gemstone*, 2019 WL 5853493, at *1 (citing 28 U.S.C. § 1355(b)(2)). To the extent that the Target Cargo is seized upon the high seas, this Court additionally has jurisdiction pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b). *See United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-CV-1791, 2020 WL 3771953 (D.D.C. July 2, 2020) ("[T]his Court has venue and jurisdiction over the Defendant Properties: (i) as they are located in a foreign country or have been detained by a foreign authority, pursuant to 28 U.S.C. § 1355(b)(2); and/or (ii) as they are on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b).").

## III.    IRANIAN PETROLEUM IS AN ASSET OF NITC AND IRGC-QF

    19.    On August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Since this appointment, the Department of the Treasury has noted the close connection between the IRGC and the Iranian petrochemical sector on multiple occasions.

    20.    On September 24, 2012, the Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), informing Congress that the Department of the Treasury determined that NIOC was an agent or affiliate of the IRGC.

21.     In 2014, the Department of the Treasury further noted that the IRGC's influence had grown within NIOC.

22.     Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia Construction Headquarters, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. During his role as Minister of Petroleum, Qasemi publicly stated his allegiance to the IRGC and the IRGC became increasingly influential in Iran's energy sector. For example, Khatam Al-Anbia obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process. *See* https://ir.usembassy.gov/our-relationship/official-reports/treasury-report-nioc-nitc/.

23.     On June 7, 2019, OFAC sanctioned Persian Gulf Petrochemical Industries Company ("PGPIC") for providing financial support to Khatam al-Anbia. PGPIC is Iran's largest and most profitable petrochemical holding group. PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports. Regarding this action, Treasury Secretary Steven T. Mnuchin stated, "By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC . . . This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."

24.     OFAC has additionally stated that Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and fund its malign activities throughout the Middle East and that Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people. *See* https://home.treasury.gov/news/press-releases/sm885.

25.     OFAC has also noted that crude oil and condensate sold by the IRGC-QF originates with NIOC, and that the IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things. Furthermore, NITC vessels have been used in IRGC-QF-run operations. *See* https://home.treasury.gov/news/press-releases/sm767.

26.     OFAC has also noted that a complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil and that in spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.

27.     OFAC has additionally stated that the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad and that the IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities. *See* https://home.treasury.gov/news/press-releases/sm703.

28.     On October 26, 2020, OFAC stated:

NIOC, overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran. NITC, a subsidiary of NIOC, is responsible for the transportation of Iranian crude exports. **NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF.** The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF.

NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. NITC personnel coordinated with the IRGC-QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hizballah on logistics and pricing for oil shipments to Syria. Sardashti also worked with Qatirji Group representative Viyan Zanganeh (Zanganeh) and a senior IRGC-QF official to facilitate the shipment of millions of dollars of oil by NITC. In 2018, OFAC designated Syrian regime-affiliated Qatirji Group for facilitating fuel trades between the Syrian regime and the Islamic State of Iraq and al Sham (ISIS), including providing oil products to ISIS-controlled territory. As of early 2020, the Qatirji Group's Zanganeh continued to work closely with the IRGC-QF to coordinate NIOC's provision of millions of barrels of oil and petroleum products to be shipped to Syria, as well as millions of dollars in payments back to Iran. In mid-2020, Zanganeh continued to act as an intermediary between the IRGC-QF and a Syrian regime-affiliated business, arranging for the funding of the release of a seized vessel and additional shipments of fuel oil.

The Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme. In mid-2019, the Ministry of Petroleum arranged the loading of hundreds of thousands of barrels of oil for shipments to Syria, and in mid-2020 the IRGC-QF and senior regime officials coordinated to use the Ministry of Petroleum to procure U.S. dollars for the benefit of the IRGC-QF.

Furthermore, in order to obfuscate its involvement in shipping activity, NITC set up a front company in the United Arab Emirates (UAE), Atlas Ship Management. NITC officials also arranged to create a separate UAE-based front company, Atlantic Ship Management Company, ostensibly as an entity to replace Atlas Ship Management.

## IV.   **SPECIFIC FACTUAL ALLEGATIONS**

29.     As described further herein, the Target Cargo originated from Kharg Island, Iran, where it was originally loaded onto NITC petroleum tanker Stark 1 (IMO 9171450) on or about October 31, 2020.

30.     On or about November 3, 2020, the Stark 1 loaded its cargo onto the ARINA via ship-to-ship transfer.

31.     On or about August 26, 2021, the ARINA transferred a portion of its cargo to M/T Nostos (IMO 9258014) via ship-to-ship transfer. Business records associated with the cargo transferred to the Nostos shows that the ARINA originally had 733,876 barrels and it is estimated

that the ARINA transferred approximately 220,793 barrels to the Nostos, leaving approximately 513,083 barrels on the ARINA, which is the Target Cargo.

**A. NITC Tanker Stark 1 Transfer of Iranian Petroleum to the ARINA**

32.    OFAC designated petroleum tanker Stark 1 on November 5, 2018, for its connection to NITC. I reviewed multiple websites, including a commercial business database used by the industry, which confirm that Stark 1 is owned and managed by NITC.

33.    A confidential human source ("CHS") who is an expert in the maritime industry and has proven reliable in the past, told law enforcement that on or about October 15, 2020, the deck of the Stark 1 was repainted in Bandar Abbas, Iran (in an apparent effort to disguise the vessel and evade detection, which I understand to be common in this industry). The Stark 1 then pulled into anchorage in Kharg Island, Iran on or about October 31, 2020. The CHS additionally provided imagery captured on October 31, 2020 of a petroleum tanker identified as Stark 1 near Kharg Island, Iran. This image is shown below:



34.    The CHS continued to track petroleum tanker Stark 1 and noted that on or about November 3, 2020, the Stark 1 pulled alongside the ARINA. The CHS provided law enforcement the following image captured on November 3, 2020, which the CHS identified as a ship-to-ship transfer between the Stark 1 and the ARINA:



35.    I have additionally reviewed similar imagery from a commercial maritime intelligence company also from November 3, 2020, which also shows the ARINA and Stark 1 pulling alongside each other, as shown below, which further corroborates the CHS information:



36.     The ARINA's Automatic Identification System ("AIS")[1] was switched off for approximately 58 hours during this ship-to-ship transfer leading me to believe that evasive steps were taken to avoid law enforcement and intelligence detection.

37.     The CHS is an expert in the maritime industry and can calculate the approximate amount of cargo loaded onto a vessel based comparing the vessel's draft before and after a transfer of cargo, which is referred to as a "draft survey" and is considered an industry standard calculation. Information about a ship's draft is reported manually via AIS and is captured by multiple reporting services as standard industry practice. According to the CHS, on November 6, 2020, the ARINA updated its draft from 8.1 meters to 14.9 meters, indicating that the ARINA took on cargo and was

---

[1] According to MarineTraffic, which provides a commercial AIS service, the International Maritime Organization requires an AIS to be fitted on every ship, with exceptions for warships, leisure craft and fishing boats. The system was introduced primarily for safety reasons by helping government authorities to identify vessels, assist in search and rescue operations as well as provide supplementary information from other navigational systems such as radar. AIS automatically transmits the ship's position and a timestamp. The ship's operator may also manually update the navigational status, ship's draft, hazardous cargo information, destination and ETA, and waypoints. *See* https://www.marinetraffic.com/blog/information-transmitted-via-ais-signal.

now fully laden. The CHS estimated that this draft change equaled approximately 728,567 barrels on the ARINA.

38.     The ARINA has a history of shipping oil for NIOC and NITC. Specifically, I am aware that the ARINA had previously engaged in a ship-to-ship transfer with a different NITC-affiliated petroleum tanker and has also previously shipped petroleum for NIOC, as further discussed herein.

39.     Business records of NIOC show the ARINA was an active carrier of Iranian oil in 2019-2020.

a.   In a related investigation, I have reviewed court-authorized search of stored communications, which included email accounts on the jeybridge.com email domain. Based on the high volume of discussions regarding NIOC shipments and payments, I believe this domain is used by individuals affiliated with NIOC. Additionally, the users of this domain in many instances appear to have redacted relevant information from emails in an apparent attempt to hide the true nature of the parties and tankers associated with many transactions. I believe that the users of these email accounts were aware of the illicit nature of their business and took steps to reduce the chance of detection.

b.   A July 4, 2020 email from mm@lavencol.com to oprt@jeybridge.com included an excel spreadsheet titled "Table-sales income –Copy.xlsx," which contained information about NIOC shipments onboard multiple tankers. The user of email account mm@lavencol.com does not list a name or signature block, but rather just the letters "MM."  The excel spreadsheet included a column titled "Nioc invoice," which law enforcement believes to be a reference to the cost to purchase the

petroleum from NIOC. The petroleum tankers listed were  "Athena, Pavino, Strength, Anisa, Escapade, Durban Sea (Trooper), Dalton ==> Leya, Dalton ==> Ramsis, Dalton ==> Ambelos, and Arina." The excel spreadsheet indicated that the ARINA shipped "Ira Light" in November 2019 which listed a NIOC invoice of $12,627,937.00. I believe this to be a reference to Iranian Light Crude Oil.

    c.   A June 24, 2020 email from mm@lavelcol.com to multiple email addresses, which copied oprt@jeybridge.com, included an email chain showing that petroleum tanker ARINA loaded Iranian petroleum in April 2020. The shipping documents were falsified to show that the Iranian petroleum was of Omani origin.[2]

    d.   A July 29, 2020 email from cmrl@jeybridge.com included a notice which purported to be to the U.S. Coast Guard, which warned that ARINA engaged in a ship-to-ship transfer with petroleum tanker Hero 2 (IMO 9362073). Publicly-available commercial information shows that petroleum tanker Hero 2 flies the Iranian flag and is operated by NITC.

40.    Further, the owner of the ARINA has received U.S. dollar payments related to these shipments of Iranian oil.

    a.   The ARINA is owned by Desero Shipping Corp ("Desero Shipping") and managed by Saint James Shipping LTD ("Saint James"), which are both located at the same

---

[2]    In a July 11, 2020 email, mm@lavencol.com forwarded oprt@jeybridge.com information about 12 SWIFT payments totaling $19,769,897.57, sent by multiple payment intermediaries, for cargo onboard petroleum tanker Escapade. The Escapade was listed on the previously described spreadsheet of NIOC shipments, with a NIOC invoice of $33,823,678.00. Based on my training and experience, I know that sanctioned entities such as NIOC often do not share such extensive information about their shipments and payment intermediaries to entities outside of their organizations. This leads me to believe that mm@lavencol.com and oprt@jeybridge.com are closely affiliated with NIOC.

address in Greece. The principal representative for Desero Shipping is listed as Morteza Rajabieslami ("Rajabieslami").

b.   On October 31, 2019, Rajabieslami wired $525.00 which passed through a U.S. correspondent bank account and referenced "OTHERS PYM FOR BWMP APPROVAL FOR  MTARINA BWMP APPROVAL FOR **MT ARINA** (emphasis added)."

c.   On November 4, 2019, Rajabieslami wired $156.80 which passed through a U.S. correspondent bank account and referenced "OTHERS MINIMUM SAFE MANNING CERTIFICATE **MT ARINA 9189952** FEE (emphasis added)."  As described previously, the ARINA loaded NIOC petroleum in November 2019.

d.   These payments show that Rajabieslami was involved with the management and payment of the ARINA at the time of the shipment of Iranian oil. Additionally, these payments would require a license from OFAC, which is located in the District of Columbia, and OFAC confirmed that no such license was sought or obtained.

**B.  The ARINA Transferred a Portion of Its Iranian Petroleum to the Nostos**

41.    The CHS continued tracking the ARINA and found no indications that the ARINA loaded additional petroleum after its ship-to-ship transfer with the Stark 1 on or about November 3, 2020.

42.    The CHS provided an image captured on August 26, 2021 of the ARINA and Nostos side by side in what appears to be a ship-to-ship transfer process approximately 26 kilometers off the coast of Limassol, Cyprus, as depicted below. The CHS additionally found no indications that the ARINA unloaded the petroleum it received from the Stark 1 until the ARINA engaged in a ship-to-ship transfer with the Nostos on or about August 26, 2021. (Based on my

training and experience, it is uncommon in this industry for a vessel to retain petroleum for this length of time, which indicates to me an issue with the would-be sale of the petroleum.)



43.     According to the CHS, at the beginning of the ship-to-ship transfer, the ARINA reported via its AIS transponder that it was fully laden, and the Nostos reported via its AIS transponder that it was empty. The CHS additionally indicated that the ship-to-ship transfer from the ARINA to the Nostos took approximately 28 hours. At the end of the transfer, the ARINA reported that its draft depth had changed from 14.9 meters deep to 11.7, indicating that cargo was unloaded. The draft depth of the Nostos changed from 7.5 meters to 9.5 meters, consistent with taking on additional cargo. Based on the change in the ARINA's draft depth, the CHS calculated that the ARINA offloaded approximately 200,477 barrels to the Nostos.

44.     I additionally reviewed data from a commercial maritime intelligence company which shows that the ARINA and Nostos were near each other at the time the image was captured, corroborating the statements made by the CHS.

45.     I have also reviewed business records related to the ship-to-ship transfer involving the ARINA and Nostos.

    e.   One document titled "Tanker Bill of Lading" indicates that the Nostos received approximately 220,793 barrels of light crude oil on August 26, 2021, which is the date when the Nostos engaged in a ship-to-ship transfer with the ARINA.

    f.   I have also received a "Certificate of Quality" for the "light crude oil" onboard the Arina. On the bottom of this document, in handwriting is written, "Document was provided from the load port 'Sohar, Oman' and handed to us by master of Arina. . . . Document as receipt from M/T Arina. Deliver to M/T/ Nostos as loading certificate of quality." The date listed on this Certificate of Quality was "12.11.2020," indicating that the petroleum on the ARINA has been on the ARINA since at least November or December 2020, depending on the date format used on this document.

    g.   I have additionally seen a "Certificate of Origin" that appears to be related to the "light crude oil" loaded onto the ARINA. This document is dated November 15, 2020. As described previously, this is shortly after the ARINA received its cargo from the Stark 1, leading me to believe that the Stark 1's petroleum remained on the ARINA until its ship-to-ship transfer with the Nostos. This Certificate of Origin additionally lists the weight as 733,876 barrels.[3]

46.     According to publicly-available sources, the ARINA is currently in the Mediterranean Sea north of the Suez Canal.

_____

[3]     As described previously, the CHS estimated that the ARINA received approximately 728,567 from the Stark 1 on November 3, 2020. I am aware that estimations and tests of the amount of petroleum onboard a vessel almost always have some variability and based on my training and experience, I believe this estimate to be within an acceptable margin of error.

## V.    ALL TARGET CARGO SUBJECT TO FORFEITURE

47.    As described above, on or about November 3, 2020, and after the U.S. government designated NITC and IRGC-QF pursuant to counter-terrorism authorities, the NITC-owned and managed tanker Stark 1 transferred Iranian oil to the ARINA via ship-to-ship transfer. A Certificate of Origin that I believe to be associated with this cargo shows that the Stark 1 transferred 733,876 barrels to the ARINA at this time. On or about August 26, 2021, the ARINA transferred a portion of its cargo, estimated to be approximately 220,793 barrels, to the Nostos via ship-to-ship transfer, leaving approximately 513,083 barrels onboard the ARINA, which constitutes the Target Cargo.

48.    As described above, the Target Cargo is property of NITC, which is being sold on behalf of the IRGC-QF, a designated foreign terrorist organization. In transferring the Target Cargo for the purposes of sale, NITC provided or attempted to provide resources to IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

49.    The Target Cargo is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as an asset of NITC, an entity that engaged in a federal crime of terrorism – providing material support to IRGC-QF, a designated terrorist organization.

50.    Additionally, the Target Cargo provides NITC with a source of influence over the IRGC-QF, within the meaning of 18 U.S.C. § 981(a)(1)(G)(i), because the Target Cargo was critical to furthering IRGC-QF's enterprise.

51.    Additionally, the Target Cargo is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), because it provides the third-party companies involved with this illicit shipment a source of influence over NITC, a designated terrorist organization which has itself engaged in a federal crime of terrorism – providing material support to IRGC-QF, also a designated terrorist organization.

**VI.**  **REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

52.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Seizure Warrant. I submit that Assistant U.S. Attorney Karen Seifert, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

VII.   **CONCLUSION**

53.    Based on security concerns raised by the nature, ownership, and location of the Target Cargo, there exists reasonable cause to permit the execution of the requested warrant at any time of day or night.

54.    Based on the information contained herein and my training and experience, I submit that the Target Cargo is subject to seizure and forfeiture, pursuant to the above referenced statutes, and I request that the Court issue the proposed seizure warrants.

Respectfully submitted,

Cindy R Burnham

Cindy Burnham, Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on October 26, 2021.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA